IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

    v.               CRIMINAL NO. 05-4 ERIE

EUGENE LAMONT GAVIN


SENTENCING



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, January 11, 2006.



APPEARANCES:
       MARSHALL J. PICCININI, Assistant United States
       Attorney, appearing on behalf of the Government.

       DANIEL J. BRABENDER, JR., Esquire, appearing on

behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1              I N D E X

2

3      WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4   FOR THE GOVERNMENT:

5   Michelle Welsh          3     18    26,32     --

6

7

8                - - -

9

10     EXHIBITS:            IDENTIFIED    ADMITTED

11   FOR THE GOVERNMENT:

12   Government Exhibit 1          28        36

13   Government Exhibit 2          33        36

14

15

16

17

18

19

20

21                    - - -

22

23

24

25



                                        3


1              P R O C E E D I N G S

2

3              (Whereupon, the Sentencing proceedings began at

4    9:55 a.m., on Wednesday, January 11, 2006, in Courtroom C.)

5

6              THE COURT:  This is the time we set for sentencing

7    in the case of United States versus Eugene Lamont Gavin.  There

8   are some exceptions to the presentence report.  Pertinently, an

9   objection to the conclusion by the probation officer as to the

10  amount of drugs involved.  Mr. Piccinini, is there going to be

11  some proof put on in that regard?

12       MR. PICCININI:  Yes, there is, your Honor.  At this

13  time I would call Michelle Welsh to testify.

14       (Recess from 9:57 a.m.; until 10:00 a.m.)

15       THE COURT:  All right, Mr. Piccinini.

16       MR. PICCININI:  Your Honor, at this time I would

17  call Michelle Welsh to testify.  Michelle, please come forward.

18       THE COURT:  Come on up here, my deputy clerk will

19  swear you in.

20       THE CLERK:  Raise your right hand.

21            MICHELLE WELSH, GOVERNMENT WITNESS, SWORN

22                 DIRECT EXAMINATION

23  BY MR. PICCININI:

24  Q.   Please state your full name for the record?

25  A.   Michelle Welsh.

4

1  Q.   Ms. Welsh, are you currently employed?

2  A.   Yes.

3  Q.   Where do you work?

4  A.   Country Fair.

5  Q.   And are you the Michelle Welsh who actually is charged in

6  the same case with Mr. Gavin in an indictment alleging the two

7  of you are involved in a conspiracy to possess with intent to

8  distribute and distribute crack cocaine?

9  A.   Yes.

10  Q.   And you were charged in this case in January of 2005, is

11  that correct?

12  A.   Yes.

13  Q.   And after you were charged in January of 2005, you sought

14  the appointment of counsel and the Federal Public Defender's

15  Office here in Erie was appointed to represent you, is that

16  correct?

17  A.   Yes.

18  Q.   You came to court here today with Assistant Federal

19  Public Defender Tom Patton, who's been representing you in your

20  criminal charges, is that correct?

21  A.   Yes.

22  Q.   Now, with regard to your current status with regard to

23  this indictment, back on August 19, 2005, did you also enter a

24  plea of guilty to your role in the conspiracy, just as Mr.

25  Gavin has?

5

1   A.   Yes.

2   Q.   Now, you're here testifying today and you've previously

3   talked to law enforcement and confessed to your role in this

4   particular offense, is that correct?

5   A.   Yes.

6   Q.   In confessing to the police and in testifying here today,

7   is it your hope -- since the time that you were talking with

8   the police throughout the last year and a half, that if you

9   were to cooperate with law enforcement, that you would receive

10  some sentencing benefit?

11  A.   Yes.

12  Q.   And when you initially confessed to the law enforcement

13  officers, members of the EAGLE Task Force, did they tell you

14  that if you came clean and confessed to your role in this

15  crime, that the information would be provided to my office and

16  that you might receive a break somewhere down the line?

17  A.   Yes.

18 Q.   Has anyone guaranteed what the judge may do if we request

19 him to reduce your sentence?

20 A.   No.

21 Q.   And with regard to your testimony here today, were you

22 arrested just like Mr. Welsh was and approached by law

23 enforcement with regard to this indictment?

24 A.   Do you mean Mr. Gavin?

25 Q.   Mr. Gavin, excuse me.


6


1 A.   Yes.

2 Q.   At the time you talked to law enforcement, were you first

3 interviewed by them concerning this particular conspiracy on

4 August 27, 2004?

5 A.   Yes.

6 Q.   And at that time did you make statements to them, in

7 August of 2004, about your conspiracy, you're being involved in

8 a conspiracy with Mr. Gavin?

9 A.   Yes.

10 Q.   Did you admit to them that you actually were purchasing

11 crack cocaine from Mr. Gavin and you actually was selling that

12  crack cocaine out on the streets in Erie?

13  A.    Yes.

14  Q.    Were you up front with them back in August of 2004?

15  A.    Yes.

16  Q.    Now, I'm going to ask you to explain to Judge McLaughlin

17  how it was that you became involved with Mr. Gavin?

18  A.    My boyfriend, Anthony Gambill.

19  Q.    And your boyfriend, Anthony Gambill, in April of 2004,

20  was he placed under arrest and sent to the Erie County Prison?

21  A.    Yes, April 2nd.

22        THE COURT:  You're going to have to keep your voice

23  up and talk slowly, please.  Start that over again.

24  BY MR. PICCININI:

25  Q.    Your boyfriend, Anthony Gambill, in April of 2004, was he


                                    7


1  placed under arrest and sent to the Erie County Prison?

2  A.    Yes.

3  Q.    And was it likely that he was going to remain in the Erie

4  County Prison or in prison for some period of time?

5  A.    Yes.

6   Q.   Prior to April of 2004, was your boyfriend, Anthony

7   Gambill, involved in the sales of crack cocaine?

8   A.   Yes.

9   Q.   And did he have various clients prior to being arrested

10   that he was able to get -- to buy crack cocaine from?

11   A.   Yes.

12   Q.   Were you living with Anthony Gambill before he went to

13   prison?

14   A.   Yes.

15   Q.   Were you pregnant at the time or did you have a child by

16   Anthony Gambill?

17   A.   Yes, after he was incarcerated.

18   Q.   After Anthony Gambill went to jail, did you and he talk

19   about you taking over his crack cocaine sales so that you could

20   make some money to afford to live by?

21   A.   Yes.

22   Q.   In your conversations with Anthony Gambill, this is while

23   he's in prison, is that correct -- you talked to him while he

24   was in jail?

25   A.   Yes.

1  Q.   What was the discussion about how and who you could buy

2  crack cocaine from?

3  A.   I was supposed to purchase it from Eugene Gavin.

4  Q.   All right.  And did Anthony Gambill attempt to take some

5  steps to smooth things out for you so that Mr. Gavin would

6  trust you enough to sell you crack cocaine so you could make

7  some money?

8  A.   Yes.

9  Q.   Did you know whether or not Anthony Gambill and Eugene

10  Gavin had a long-term relationship, either as friends or

11  relatives or anything along those lines?

12  A.   Yes.

13  Q.   What was the nature of their relationship?

14  A.   They had been friends since high school, I believe.

15  Q.   And did it appear that Eugene Gambill trusted you enough,

16  Eugene Gavin trusted you enough after Anthony Gambill went to

17  prison that he would sell you crack cocaine?

18  A.   Yes.

19  Q.   Did you take steps to call or talk to Eugene Gavin about

20  selling crack cocaine to you?

21  A.   Yes.

22  Q.   And can you indicate to Judge McLaughlin how those

23  conversations went and how did it come about that you bought

24  crack cocaine from him?

25  A.   Anthony cleared it with Eugene --


                                    9


1        THE COURT:  Start that over again, please slow down.

2  Go ahead.

3        THE WITNESS:  Anthony cleared it with Eugene Gavin.

4  BY MR. PICCININI:

5  Q.   He cleared it with Eugene Gavin?

6  A.   Yes.

7  Q.   Then what did you do, how did you reach out to him?

8  A.   I called his cell phone.

9  Q.   You called whose cell phone?

10  A.   Eugene's.

11  Q.   How did you have Eugene's cell phone number?

12  A.   Say that again.

13  Q.   How did you have Eugene's cell phone number?

14  A.   Anthony gave it to me.

15  Q.    And when you called Eugene Gavin on the cell phone --

16  would the first time have been sometime in April of 2004 after

17  Anthony Gambill went to prison?

18  A.    Yes.

19  Q.    In your conversation with him, did you request in some

20  fashion that he sell crack cocaine to you?

21  A.    Yes.

22  Q.    What arrangements were made as to how much cocaine you

23  would purchase and where you would purchase it from?

24  A.    The arrangements were that --

25          THE COURT:  Say that again, please.


                                    10


1          THE WITNESS:  The arrangements were that he was

2  going to give me a deal on eight-balls.

3  BY MR. PICCININI:

4  Q.    On eight-balls?

5  A.    Yes.

6  Q.    And an eight-ball is an eighth ounce of cocaine?

7  A.    Yes.

8  Q.    Are we talking powder or crack cocaine here?

9   A.   Crack cocaine.

10   Q.   So Eugene was going to give you a deal on eight-balls?

11   A.   Yes.

12   Q.   How much did you understand you were going to be paying

13   for those eight-balls?

14   A.   $130.

15   Q.   And where were you supposed to purchase the cocaine, the

16   crack cocaine from Eugene Gavin?

17   A.   I met him at his house.

18   Q.   Can you indicate to the court where his house was

19   located?

20   A.   I'm not sure of the address, but it was on West 20th

21   Street.

22   Q.   How did you know where the place was?

23   A.   Anthony took me over there before.

24   Q.   So prior to April you had been over to that residence?

25   A.   Right.


11


1   Q.   After Eugene arranged to sell you the crack cocaine, did

2   you go to his house and purchase an eight-ball?

3  A.   Yes.

4  Q.   Explain to Judge McLaughlin when you first went to his

5  residence -- first of all, describe the residence for the

6  judge, indicate whether or not you actually had been there and

7  how often, would you describe it for him?

8  A.   It was -- they had a purple door downstairs, you walk up

9  the stairs and you walk into his living room.  It's like all

10  opened.

11  Q.   During the course of the time you were purchasing crack

12  cocaine from Mr. Gavin, did you meet members of his family

13  there at the house?

14  A.   Yes.

15  Q.   Who would you have met?

16  A.   His wife, Bernadette, there was a child there.

17  Q.   And what would you guys do there at the house on those

18  occasions when you purchased crack cocaine?

19  A.   We would smoke marijuana.

20  Q.   And who would you smoke the pot with?

21  A.   Eugene Gavin and Bernadette Gavin.

22        THE COURT:  And who?

23        THE WITNESS:  Bernadette Gavin.

24        THE COURT:  That's his wife?

25          THE WITNESS:  Yes.


                              12


1  BY MR. PICCININI:

2  Q.    So while you're there smoking pot at the house, did you

3  also purchase crack cocaine?

4  A.    Yes.

5  Q.    Was there ever a time that you went to Gavin's house

6  after April of 2004 that you didn't purchase crack cocaine from

7  him?

8  A.    No.

9  Q.    Did you ever just go over there just to smoke pot with

10  them or just to socialize?

11  A.    No.

12  Q.    So every time you went to his house, did you purchase

13  crack cocaine?

14  A.    Yes.

15  Q.    And, typically, what was the quantity of crack cocaine

16  that you purchased?

17  A.    An eight-ball.

18  Q.    And in most instances, almost every instance where you

19  purchased crack cocaine, was it an eight-ball?

20  A.    Yes.

21  Q.    After you went there on the first occasion with regard to

22  purchasing crack cocaine, once you got the cocaine from Mr.

23  Gavin, how long would it take you to sell the crack cocaine?

24  A.    It started out overnight.

25  Q.    So overnight you'd be able to sell the eight-ball that he


13


1  sold to you?

2  A.    Yes.

3  Q.    How much money were you able to make off the sale of the

4  crack cocaine?

5  A.    280, 260.

6  Q.    So $260 to $280?

7  A.    Yes.

8  Q.    And when you got the crack cocaine from Mr. Gavin, had he

9  taken these steps to assist you in either breaking it down or

10  discussing with you as to how those sales should occur?

11  A.    Yes.

12  Q.    Tell Judge McLaughlin what it is he did with the cocaine

13   so that you were prepared to sell it?

14   A.    He gave it to me bagged up in little rocks.

15   Q.    And in the eight-ball, that was a combination of a bunch

16   of little rocks?

17   A.    Yes.

18   Q.    What size rocks were they?

19   A.    Twenty pieces.

20   Q.    Do you mean $20 rocks?

21   A.    Yeah, $20 rocks.

22   Q.    So each rock you could sell on the street for $20?

23   A.    Yes.

24   Q.    You said that you would be able to sell the eighth ounce

25   overnight?

14

1   A.    Yes.

2   Q.    When you would run out of the crack cocaine that Mr.

3   Gavin sold to you, how long would you wait until you'd go back

4   to him to get more?

5   A.    The next day.

6   Q.    As soon as you ran out, would you go back to him?

7   A.   The next day.

8   Q.   So if you sold out overnight, the next day you'd go to

9   him to get more?

10   A.   Yes.

11   Q.   In this particular hearing there's been a claim that Mr.

12   Gavin only sold crack cocaine to you on two occasions, two

13   eight-balls, which is about three-and-a-half grams apiece,

14   around seven grams.  Can you indicate to Judge McLaughlin --

15   and you're charged in this conspiracy as well?

16   A.   Yes.

17   Q.   Whether your sales or your purchases of crack cocaine

18   were only limited to those two occasions?

19   A.   No.

20   Q.   Over that period of time where you were purchasing from

21   him and you say you ran out, you'd go back to him the next day,

22   how frequently would you be going back to him, for what period

23   of time?

24   A.   It first started out the next day and then it wasn't

25   right so --

15

1          THE COURT:  Say that again, please?

2    BY MR. PICCININI:

3    Q.    It wasn't right you said?

4    A.    Yes.

5    Q.    And what do you mean it wasn't right?

6    A.    Like they did something to it, the people weren't liking

7    it.

8    Q.    So the people who were your clients who you were selling

9    it to didn't like the quality of the crack cocaine?

10   A.    Right.

11   Q.    And did that cause it to be a couple of days for you to

12   get rid of the crack cocaine, instead of overnight?

13   A.    Yes.

14   Q.    And over what period of time were you going back to his

15   house, either every other day, excuse me, every day or every

16   other day, how long did that go on?

17   A.    Till the beginning of June.

18   Q.    Okay.

19          THE COURT:  When did it start?

20          THE WITNESS:  April.

21          THE COURT:  And in any given week between April and

22  June, how often did you go to his house to buy the crack

23  cocaine?

24          THE WITNESS:  Every couple days.

25          THE COURT:  So does that mean three days a week?


                              16


1          THE WITNESS:  Yes.

2          THE COURT:  Go ahead.

3  BY MR. PICCININI:

4  Q.    And on those three days a week would you be purchasing an

5  eight-ball of crack cocaine?

6  A.    Yes.

7  Q.    Did there come a point in time where Mr. Gavin -- well,

8  let me go back a second.  In the beginning when you were

9  purchasing crack cocaine from him, how were you paying for the

10  cocaine?

11  A.    The first two times I paid cash, and then I lost the

12  last.

13  Q.    What do you mean you lost the last?

14  A.    I lost the last package he gave me.  So Anthony called

15  him and asked if he could front me something.

16  Q.   Front you something?

17  A.   Yes.

18  Q.   What does that mean to front you something?

19  A.   To give me the drugs and after I sell them, I give him

20  the money.

21  Q.   So the first couple times you paid him up front for the

22  eight-ball?

23  A.   Yes.

24  Q.   And then after that, was there a period of time where he

25  was fronting you, giving you the drugs up front, and then you

17

1  paid him afterwards for the drugs?

2  A.   Yes.

3  Q.   And on how many occasions were you fronted the drugs?

4  A.   I don't remember.

5  Q.   How often were you fronted drugs?

6  A.   Every couple days.

7  Q.   When you look back now, it's now January of 2006, when

8  you look back at the time period you were buying from Eugene

9  Gavin, can you recall for the judge, just going back to his

10  house frequently on a regular basis?

11  A.    Yes.

12  Q.    Were you at his house on more than 10 occasions?

13  A.    Yes.

14  Q.    And there was never a reason for you to go to the house

15  other than to buy an eight-ball of crack cocaine?

16  A.    Right.

17  Q.    And, Ms. Welsh, you realize that from your testimony and

18  from your statement to law enforcement, that your own

19  Sentencing Guidelines that you are facing in this case have

20  been calculated because of how much crack cocaine you said you

21  purchased from Eugene Gavin, do you realize that?

22  A.    Yes.

23  Q.    So why is it that you're here today telling the judge

24  that you bought more crack cocaine from Eugene Gavin --

25          MR. BRABENDER:  Your Honor, I would object to that.


18


1          THE COURT:  Overruled.

2  BY MR. PICCININI:

3  Q.    Why are you telling the judge that you bought more crack

4  cocaine from Eugene Gavin than Mr. Gavin is even saying you

5  bought?

6  A.  I'm telling the truth.

7  Q.  When they approached you in August of 2004, did you feel

8  pretty confident that you were busted and the EAGLE Task Force

9  guys, they had the goods on you and you were in trouble?

10  A.  Yes.

11  Q.  Is that why you confessed to them at that time?

12  A.  Yes.

13       MR. PICCININI:  That's all I have.

14       THE COURT:  All right, Mr. Brabender.

15       MR. BRABENDER:  Thank you, your Honor.

16            CROSS-EXAMINATION

17  BY MR. BRABENDER:

18  Q.  Ms. Welsh, you were indicted for this conspiracy in

19  January of 2005?

20  A.  Yes.

21  Q.  And on August 19th do you recall your testimony of 2005,

22  that's when you pled guilty as charged, is that correct?

23  A.  Yes.

24  Q.  And in your testimony you said that you were interviewed

25  by the authorities regarding this on August 27th of 2004, did

19

1  you actually mean 2005 -- I think you responded yes to the

2  question was it August 27th of '04, was it actually after you

3  pled guilty that you sat down with the authorities?

4  A.   No.

5  Q.   It was before?

6  A.   Yes.

7  Q.   So it was August 27th of '04?

8  A.   Yes.

9  Q.   In other words, before you were indicted in this matter?

10  A.   Yes.

11  Q.   Okay.  Now, your testimony is that it was sometime after

12  April of '04 that you had contact with Mr. Gavin regarding the

13  sales of cocaine, true?

14  A.   Yes.

15  Q.   Do you know exactly when it was in April of '04 that your

16  boyfriend, Mr. Gambill, went to prison?

17  A.   April 2nd.

18  Q.   April 2nd?

19  A.   Yes.

20  Q.   And, furthermore, your testimony is that you would meet

21  with Mr. Gavin at his house on West 20th Street, smoke weed and

22  eventually purchase crack cocaine, true?

23  A.   Yes.

24  Q.   Did you ever purchase more or less than an eight-ball of

25  crack from Mr. Gavin?

                                    20

1  A.   I don't remember.

2  Q.   Can you tell me how many rocks are in an eight-ball that

3  you would purchase?

4  A.   I don't remember.

5  Q.   When you say that you would make between $260 to $280

6  when you sold an eight-ball, was that profit or the total

7  amount that you would receive?

8  A.   Would you say that again.

9  Q.   Okay.  You said that you would purchase an eight-ball

10  from Mr. Gavin for $130, true?

11  A.   Yes.

12  Q.   Was that always the price or could it have been more or

13  less than that?

14   A.   No, that was always the price.

15   Q.   Okay. And then your testimony was that you'd get between

16   $260 and $280 for the sales that you made; was that the total

17   amount that you would receive or did you consider that profit

18   over the $130?

19   A.   No, that was the total amount.

20   Q.   You said this activity began in April of '04 and

21   continued until the beginning of June, true?

22   A.   Yes.

23   Q.   So your testimony is that, basically, the entire month of

24   April and the entire month of May you purchased cocaine from

25   Mr. Gavin, correct?

21

1   A.   Yes.

2   Q.   And if I recall your testimony, you said that would be

3   usually about three times a week?

4   A.   Yes.

5   Q.   So that gets us into the range where you were there maybe

6   25 to 30 times?

7   A.   I was there quite a few times.

8   Q.   As you did testify near the end of your testimony, you

9   said you were telling the truth, right?

10  A.   Yes.

11  Q.   Do you recall being interviewed back in August of '04 by

12  FBI agents concerning this matter?

13  A.   Yes.

14  Q.   Were you telling the truth back then?

15  A.   Yes.

16  Q.   Is it true that you told the authorities then that you

17  purchased an eighth of an ounce of crack cocaine from Mr. Gavin

18  every few days for just a couple of weeks?

19  A.   Yes.

20  Q.   Okay.  And you were telling the truth back then?

21  A.   Yes.

22  Q.   When you say the words "a couple of weeks," do you mean

23  two weeks, is two a couple to you?

24  A.   No, it went between April to June, beginning of June.

25  Q.   So are you saying -- could you state yes or no then as to

22

1   whether or not you were telling the truth if you said this

2  activity was for a couple of weeks?

3  A.  Yes.

4  Q.  You were telling the truth?

5  A.  Yes.

6  Q.  And a couple of weeks to you is two weeks or not?

7  A.  I don't know.

8  Q.  What does the word couple mean to you?

9  A.  A couple -- they happened between April and June.

10  Q.  Do you know what a 5K1.1 motion is?

11  A.  No.

12  Q.  Was that ever explained to you by authorities or your

13  attorney or the court?

14  A.  I'm pretty sure.

15  Q.  You know it's an avenue whereby you could basically get a

16  sentencing bargain after you pled guilty if you cooperated and

17  gave substantial assistance to authorities?

18  A.  Yes.

19  Q.  And that was your purpose here, after you did plead

20  guilty, to give that substantial assistance and get a

21  sentencing break, true?

22  A.  Yes.

23   Q.   Have you been sentenced yet?

24   A.   No.

25   Q.   When are you supposed to be sentenced?


23


1   A.   February 1st.

2   Q.   Was it at the conclusion of Mr. Gavin's case, to see what

3   happens to him?

4   A.   No.

5   Q.   Has there been continuances for your sentencing at all?

6   A.   Yes.

7   Q.   Has there been any particular reason why it's been

8   continued?

9   A.   I was pregnant, it was November 16th and I was pregnant,

10   I just had my baby November 23rd.

11   Q.   Now, to receive the sentencing benefits that you expect

12   to get, you know you had to give information and at least come

13   here today and testify against Mr. Gavin, right?

14   A.   Yes.

15   Q.   And if you did not do that, you would not get those

16   sentencing benefits that you think you might receive, true?

17  A.   Yes.

18  Q.   Now, do you have any notes regarding your activities,

19  your purchases from Mr. Gavin, would you have had -- anything

20  other than your word, anything that you would have written

21  these are the days I went to see him?

22  A.   No.

23  Q.   You obviously had some regular customers and you had

24  received those names from your boyfriend, Mr. Gambill, right?

25  A.   Yes.

24

1  Q.   How did you know who these customers were?

2  A.   By my mother.

3  Q.   I'm sorry.

4  A.   My mother is an addict, they were friends.

5  Q.   So how was it -- did you get this information from your

6  mother then?

7  A.   What information?

8      THE COURT:  Start that again, I don't think she

9  understands the question.

10  BY MR. BRABENDER:

11  Q.    Okay, I'll back up a little bit.  You got names from Mr.

12  Gambill, your boyfriend, after he was sent to prison, true?

13  A.    Yes.

14  Q.    Now, you mentioned that they were addicted friends of

15  your mother, is that what you said?

16  A.    Yes.

17  Q.    Did you get these names of people to sell crack to from

18  your mother or from Mr. Gambill?

19  A.    Both.

20  Q.    Both, okay.  Now, do you have these names and addresses

21  written down anywhere?

22  A.    No.

23  Q.    I'm not going to ask you for any names, but did you have

24  any notes whatsoever?

25  A.    No.


                                25


1  Q.    Can you tell how many names Mr. Gambill gave you?

2  A.    It was quite a few.

3  Q.    How would you remember who they were or where they were,

4  what their phone numbers were?

5   A.   We had a cell phone.

6   Q.   Did you log those names and numbers into your cell phone?

7   A.   Yes.

8   Q.   Are you saying every cell phone number that you would

9   have to call people on was in that cell phone?

10  A.   No.

11  Q.   Did the authorities take your cell phone?

12  A.   No.

13  Q.   Did they do anything to verify those numbers being on

14  your telephone, cell phone?

15  A.   No.

16  Q.   Where is that particular cell phone today?

17  A.   I lost it.

18  Q.   You lost it.  When did you lose it?

19  A.   I don't remember.

20  Q.   Do you have any notes on the amount of profit that you

21  had whatsoever?

22  A.   No.

23  Q.   Did you have anything to verify what you told the FBI

24  agents on August 27, 2004 or what you're telling us today,

25  other than your own word?

1  A.  Right.

2  Q.  You don't have anything further, right?

3  A.  No.

4  Q.  I don't want to tread too much on the same subject here

5  but, once again, the frequency you said you would be at Mr.

6  Gavin's house every other day; in other words, you would sell

7  this crack overnight and be back the next day?

8  A.  Right, the first couple times.  And then it was every

9  couple days.

10  Q.  Now, your testimony is that was for a couple of weeks or

11  a couple of months?

12  A.  Couple of months.

13  Q.  Now, that's not what you told the FBI agents on August

14  27th of '04, right?

15  A.  Right.

16      MR. BRABENDER:  Okay.  I have nothing further.

17           REDIRECT EXAMINATION

18  BY MR. PICCININI:

19  Q.  Ma'am, with regard to why your sentencing was continued

20  until after Mr. Gavin's sentencing, did your attorney on

21  November 10, 2005, file a motion to continue the sentencing

22  hearing?

23  A.    Yes.

24  Q.    And at that time, as noted in paragraph three of this

25  particular motion, it indicates here that you were pregnant,

27

1  that due your due date was on November 26, 2005, is that

2  correct?

3  A.    Yes.

4  Q.    And was your pregnancy, as indicated in this motion

5  classified as high risk due to the recency of the last

6  pregnancy?

7  A.    Yes.

8  Q.    Was there some concern that you not undergo the stress of

9  a possible prison sentence 10 days before your due date, which

10  is when your original sentence was scheduled?

11  A.    Yes.

12  Q.    In addition, did your attorney request a 60 day

13  continuance because you needed to make arrangements after the

14  baby was born for custody of the child should a sentence of

15  prison be imposed?

16  A.   Yes.

17  Q.   So this moving of the sentencing, did it have anything to

18  do with Mr. Gavin's sentencing here today?

19  A.   No.

20  Q.   Now, Ms. Welsh, I need to clarify some points because of

21  information that I have in my possession that has been provided

22  to the defense, with regard to some conversations you continued

23  to have with Anthony Gambill while he was in prison.  Maybe at

24  the time neither one of you realized it, but all those prison

25  conversations were recorded, you now know that, is that

                                  28

1  correct?

2  A.   Yes.

3  Q.   You have been provided, through defense counsel, as well

4  as Mr. Gavin, not only the recordings themselves but

5  transcripts of those particular calls?

6  A.   Yes.

7  Q.   I'm going to approach you and show you what appears to be

8  a telephone conversation dated May 30, 2004, between yourself

9   and Mr. Gambill.  My concern is that you be able to answer

10  because it reflects somewhat I think on the judge's

11  determination as to whether or not all the way into June of

12  2004 you were continuing to purchase crack cocaine.

13         MR. PICCININI:  Your Honor, I'm going to mark this

14  as Government Exhibit 1 just for identification purposes.

15         THE COURT:  All right.

16  BY MR. PICCININI:

17  Q.    Ma'am, at the top of this it purports to be May 30, 2004

18  at 15:22 or 3:22 in the afternoon, to 3:37 in the afternoon, a

19  conversation between you and Anthony Gambill, while Anthony

20  Gambill was incarcerated in the Erie County Prison, do you see

21  that?

22  A.    Yes.

23  Q.    And at the beginning of the conversation there's a couple

24  instances here where actually you and Mr. Gambill talk about

25  Eugene Gavin, I want to go through that with you.  At the


                                    29


1   beginning it's you speaking and you say, "I talked to Antonio

2   yesterday."  And Mr. Gambill says "what did he say."  At this

3  time you're not cooperating, this is just a phone conversation

4  that either of you either don't realize is recorded or you just

5  didn't care, one way or the other, is that correct?

6  A.   Yes.

7  Q.   This isn't you wearing a wire or in any fashion

8  cooperating against Mr. Gambill or Mr. Gavin at that particular

9  time, this is just a conversation you're having over the phone

10  that happens to be recorded by the prison officials, right?

11  A.   Right.

12  Q.   And when you say "I talked to Antonio yesterday," are you

13  referring to an Antonio Bolden?

14  A.   Yes.

15  Q.   Mr. Gambill says "what did he say."  And you respond,

16  "I was like what you all just forgot about your homeboy."

17  And Mr. Gambill says "and what did he say."  "He was like, no I

18  got a job now I don't hustle.  I was like damn.  What happened

19  to Gene and he was like um, Gene fell off."

20      So on May 30, 2004, first of all, this Antonio is

21  indicating that he got a job and he's not hustling.  But he

22  specifically told you about Gene, that he liked fell off.  What

23  did he mean on May 30, 2004, asking about what the deal was

24  with Gene, he fell off?

25  A.   That he wasn't selling drugs no more.

30

1        THE COURT:  Say that again into the microphone?

2        THE WITNESS:  He wasn't selling drugs no more.

3  BY MR. PICCININI:

4  Q.   And then on the next page, page two of the transcript,

5  here you say, talk about how much money Gene owes you.  And Mr.

6  Gambill responds "Gene owes me like two hundred dollars."

7  When you started in the drug dealing relationship with Mr.

8  Gavin, did you know in the beginning that Mr. Gavin owed

9  Anthony Gambill some money for some previous drug debts?

10  A.   No.

11  Q.   You didn't know that?

12  A.   No.

13  Q.   Did you find out over time that Mr. Gavin owed Anthony

14  Gambill some money?

15  A.   Yes.

16  Q.   And might that be why he was able to convince Mr. Gavin

17  to deal with you during this timeframe?

18  A.   Yes.

19       MR. BRABENDER:  Your Honor, I would object.

20       THE COURT:  Sustained.

21  BY MR. PICCININI:

22  Q.   My question for you, Ms. Welsh, is that you testified

23  that from April to June, to the beginning of June, in fairness

24  to you, you did say the beginning of June, that you were

25  purchasing crack cocaine from Mr. Gavin.  But this transcript


31


1  seems to reflect that you've testified that as of May 30, 2004,

2  Gene fell off?

3  A.   Yes.

4  Q.   Can you explain to Judge McLaughlin how was it that you

5  could have been purchasing crack cocaine from Mr. Gavin if Mr.

6  Gavin stopped selling crack cocaine, according to this

7  transcript, on May 30, 2004?

8  A.   I don't remember.

9  Q.   Okay.  How far into May were you still purchasing crack

10  cocaine from Mr. Gavin; you said the beginning of June, here is

11  May 30th, the end of May that he's done, did it even go into

12  May of 2004?

13  A.   I don't remember.

14  Q.   Do you recall going to the place with the purple door

15  where Mr. Gavin and his wife would smoke pot with you, do you

16  recall going to his residence at least let's say 10 times?

17  A.   Yes.

18  Q.   And was there ever a time that you didn't purchase an

19  eight-ball of crack when you went there?

20  A.   No.

21        MR. PICCININI:  That's all I have.

22        THE COURT:  Mr. Brabender, do you have anything

23  else?

24        MR. BRABENDER:  Nothing further from this witness,

25  your Honor.


32


1        THE COURT:  Why did you tell the FBI a couple of

2  weeks -- let me put it this way.  Is your recollection, as you

3  testified today, as to the number of weeks that you went over

4  to purchase crack cocaine, different today than it was when you

5  talked to the FBI?

6          THE WITNESS:  Yes, because I don't remember

7   everything now.

8          THE COURT:  What is your best recollection as you

9   testify today, as to the number of times you purchased crack

10  cocaine from Mr. Gavin?

11         THE WITNESS:  I don't know.

12         THE COURT:  You don't know?

13         THE WITNESS:  (Witness shakes head.)

14         THE COURT:  You can get off the stand.  Do you have

15  something else, Mr. Piccinini?

16         MR. PICCININI:  Yes, your Honor.

17         THE COURT:  Hang on one second, get back on the

18  stand.

19              FURTHER REDIRECT EXAMINATION

20  BY MR. PICCININI:

21  Q.    Ma'am, the judge referred to your August 27, 2004

22  interview with the FBI.  On August 27, 2004, was that the day

23  that the police first approached you and confronted you about

24  your drug dealing activities with Eugene Gavin?

25  A.    Yes.

33

1  Q.    And on that particular date were you asked questions

2  about how often you purchased from Eugene Gavin?

3  A.    Yes.

4  Q.    On August 27, 2004, had you asked for Mr. Patton to be

5  appointed to your case yet, did you even have a lawyer?

6  A.    No.

7  Q.    At that point in time, did anyone talk with you about --

8  did any attorney talk with you about a sentencing reduction,

9  filing a motion on your behalf?

10  A.    No.

11  Q.    Did anyone talk with you at that time about the

12  sentencing guidelines and the benefit you would receive from a

13  lower quantity of crack cocaine, anybody talk with you about

14  that?

15  A.    No.

16  Q.    Now, the agents did tell you that it would be in your

17  best interests to come clean on what you were doing, is that

18  correct?

19  A.    Yes.

20  Q.    All right, I'm going to show you what I will refer to as

21  Government Exhibit No. 2 for identification -- ma'am, this

22   purports to be the FD-302 of the interview that you gave on

23   August 27, 2004, to Special Agent Jason Crouse and Detective

24   Sergeant Jeff Greene, is that correct?

25   A.   Yes.


34


1   Q.   Now, on the second page of this document I'm going to ask

2   you was your recollection of the events that occurred in April

3   of 2004 through May of 2004 better back in August, within a

4   couple of months of this happening, than it is here today, in

5   fairness, two years later?

6   A.   Yes.

7   Q.   Would it refresh your recollection as to your involvement

8   with Mr. Gavin if you were to review that 302 from August of

9   2004?

10   A.   Yes.

11   Q.   I'm going to ask you to read those highlighted paragraphs

12   on there, these two that have been highlighted.  Ma'am, Judge

13   McLaughlin has asked you why did you tell them two weeks, now

14   you're saying what could be as long as two months.  That's not

15   a hard question.  And I put you on the witness stand, I want to

16  make sure you're telling the truth.  How frequently do you

17  recall going back to this man's house, he says it was twice and

18  on the third time he wasn't about to front you the cocaine.

19  Was it two times, was it 10 times -- you couldn't tell the

20  judge exactly how many times, I don't know if we would be able

21  to expect you to recount each one -- but is Mr. Gavin right or

22  are you correct?

23  A.    I'm telling the truth, I just don't remember right now.

24  Q.    How often did you go to his house, you were able to give

25  the judge a description of the house, what you did in the


                                35


1  place, did you just go there a couple times?

2  A.    No, I went there more than a couple times.  It could have

3  been like -- three weeks or five weeks, I'm not sure, I don't

4  remember.  But I went to his house quite a few times.  I'm not

5  sure when it stopped.

6  Q.    Was it at least two weeks?

7  A.    Again, it could have been.

8  Q.    Could it have been less than two weeks, just a couple of

9  days?

10  A.    No.

11          MR. PICCININI:  That's all I have, judge.

12          THE COURT:  Mr. Brabender, do you have anything

13  else?

14          MR. BRABENDER:  I have no further questions.

15          THE COURT:  What is the least amount of time you

16  visited in weeks, if indeed it is weeks, what is the least

17  amount of weeks that you visited this man's house for the

18  purpose of purchasing crack?

19          THE WITNESS:  Between two to three weeks.

20          THE COURT:  All right, you can get down.  Anything

21  else from the government?

22          MR. PICCININI:  No, your Honor.

23          THE COURT:  Did you move those exhibits, Mr.

24  Piccinini?

25          MR. PICCININI:  I did not.  I'll mark them as


                              36


1  Government Exhibit No. 1 and Government Exhibit 2 and move them

2  into evidence.

3          THE COURT:  Those are admitted.  Anything further

4  from the government on any point?

5         MR. PICCININI:  No, your Honor.

6         THE COURT:  Anything from you, Mr. Brabender?

7         MR. BRABENDER:  Yes, your Honor, Mr. Gavin would

8  testify.

9         THE COURT:  We're going to take a short recess

10  before we pick up on this.

11         (Recess from 10:40 a.m.; until 10:44 a.m.)

12         THE COURT:  All right, Mr. Brabender.

13         MR. BRABENDER:  Your Honor, after discussion with

14  Mr. Gavin, we're not going to present any evidence.

15         THE COURT:  All right.  It appears that none of your

16  other exceptions here affect the guideline range, is that

17  right?

18         MR. BRABENDER:  That's correct, your Honor.

19         THE COURT:  What do you want to tell me by way of

20  brief summary about this, Mr. Piccinini -- obviously, you got

21  to prove it by a preponderance and consistent with the

22  principles articulated in -- I believe it was United States v.

23  Gibbs?

24         MR. PICCININI:  Yes, your Honor.  Just more of a

25   practical point.  The guideline applies at level 28 to the

37

1   defendant, applies to quantities in excess of 20 grams.  So the

2   court is in a position of making estimations, here it doesn't

3   have to be the exact, I think 31.83 grams, but it has to be

4   grams or more to stay at that quantity.  And the law, as you

5   indicated, there needs to be sufficient evidence, reliability

6   to support its probable accuracy.  From another practical

7   standpoint, it has been my experience and maybe this is the

8   exception, that people come into court and increase the amount

9   of drugs that are attributable, because Ms. Welsh's guideline

10   ends up being the same as Mr. Gavin's based upon what she says.

11   At all times had the opportunity to downplay her role, that is

12   what we typically see.  And her recollection today isn't great

13   two years later of the exact number of times.  But, judge, it

14   was more than enough times to exceed 20 grams of crack cocaine,

15   to find three-and-a-half grams, an eight-ball at a time, she

16   was there just on a regular basis.  Let's say it's more than 10

17   times, which is fewer than the calculation by probation, which

18   far exceeds the 20 gram threshold.

19        THE COURT:  What would it have to be, just

20  arithmetically, how many purchases are there for 20 grams?

21        MR. PICCININI:  As few as seven would get you beyond

22  21 grams.  Even possibly six times would get you, six times

23  three and a half would just be over 20 grams.  That's all I

24  have, your Honor.

25        THE COURT: All right.  Mr. Brabender.


38


1        MR. BRABENDER:  Your Honor, just briefly, I truly

2  believe that the testimony was far too vague and without the

3  prodding she received from the questioning and without her own

4  puffing, I don't really think we're leaving this hearing today

5  knowing what the quantities were, how many occasions there

6  were.  If you believe the FBI reports, she was purchasing crack

7  from other individuals as well.  I'm not sure about the

8  timeframes here, being it was several months later that she was

9  originally questioned by the FBI concerning this, now another

10  year and a half after that she's testifying today, I think we

11  leave this hearing not knowing what the amount was.  She

12  understands the 5K1.1 deal, that she has to be here to testify,

13  she knows she has to give evidence against Eugene Gavin.  I

14  think it was stated that she was in probably at the time

15  smoking marijuana and maybe doing drugs.  Here we have this

16  individual that sells crack rocks to her mother's best friends,

17  I mean, how much of her testimony are we suppose to believe

18  really, your Honor.  I would just think in the interest of due

19  process this has not been proven by a preponderance.

20        THE COURT:  You understand full well you don't have

21  the burden, it's the government's burden.

22        MR. BRABENDER:  Right.

23        THE COURT:  But you suggest in your papers that

24  there were two sales?

25        MR. BRABENDER:  Well, that's what we allege.  I know

39

1  we didn't testify.

2        THE COURT:  I have no evidence on this record on

3  that point, but that's the contention in the papers, though, is

4  that correct?

5        MR. BRABENDER:  Yes, your Honor.  That's what I

6  believe Mr. Gavin told Mr. Lowers at the time of the

7    presentence, I think.  I'd have to double check my records.

8    THE COURT:  All right.

9    MR. BRABENDER:  That's what we do allege, your

10   Honor.  Thank you.

11   THE COURT:  Let me get an order here on the record.

12   ORDER

13   Presently pending before the court are exceptions to

14   the presentence report filed on behalf of the defendant.

15   Specifically, the defendant objects to the finding by the

16   probation officer wherein he attributed 31.89 grams of crack

17   cocaine.  The defendant contends in its papers that as a matter

18   of fact there was significantly less crack cocaine involved.

19   According to the defendant, approximately "seven grams only."

20   The upshot of which, according to the defendant, would be to

21   reduce the total offense level from 25 to 23.

22   In resolving this issue, I am guided by the

23   principles set forth in United_States_v._Gibbs, 190 F.3d 188
         ————— ————— —— —————

24   (3rd Cir. 1999).  Specifically, evidence supporting a finding

25   of drug quantity must have "sufficient evidence of reliability

40

1    to support its probable accuracy." That would be at page 203.

2    And, additionally, "it is appropriate to estimate drug quantity

3    based on evidence of the average drug transaction during the

4    course of the conspiracy." That would be at page 219.

5           In this case the government presented the testimony

6    of Michelle Welsh. Based upon her testimony and, of course, my

7    opportunity to observe her demeanor and draw conclusions with

8    respect to her credibility, I find that subsequent to her

9    boyfriend, Anthony Gambill's incarceration, arrangements were

10   made whereby she would become involved in drug transactions

11   with Mr. Gavin. I find credible her testimony with respect to

12   her visitations to Mr. Gavin's home. I find that she described

13   it with such particularity that it lends additional credence to

14   her contention that she was there. Ms. Welsh testified that as

15   a general proposition when she was present at the home, she

16   purchased what she referred to as eight-balls. Otherwise,

17   which would be the same as one-eighth ounce of crack cocaine.

18          I also find her testimony credible to the extent

19   that she testified that the eight-balls were broken up by Mr.

20   Gavin into smaller rocks for sale on the street in the amount

21   of $20 per rock.

22          I find her testimony credible in that she frequented

23   Mr. Gavin's home for the purpose of purchasing crack cocaine

24   two or three times a week.

25          With respect to the duration of the purchases, the

41

1   witness indicated here that she thought it was for a period of

2   time from April through May.  She sometime ago, when initially

3   interviewed by the FBI, the record reflects that she had

4   indicated that she had purchased crack cocaine from Mr. Gavin

5   over a period of a couple of weeks.  On this point I do not

6   find that the witness, to the extent that the witness's

7   testimony today was a longer period of time, I do not find her

8   testimony to have been intentionally deceptive.  I find, based

9   upon all the testimony, that the government has demonstrated by

10  a preponderance of the evidence that there were sufficient, and

11  I so find, that there were sufficient visits to Mr. Gavin's

12  residence and sufficient purchases of crack cocaine to

13  substantiate the finding by the probation officer of 31.89

14  grams of cocaine.

15          I also note for the record that an additional

16  indicia of reliability lies in the fact that by testifying in

17  the manner in which she has, the witness has in fact increased

18  her own drug quantity for sentencing purposes, rather than

19  reduced it.  The exception is overruled.

20        I make the following findings.  The total offense

21  level is 25; with a criminal history category of V.  Statutory

22  provision as to custody not less than five years to 40 years

23  imprisonment.  Guidelines 100 to 125.  Statutory provision as

24  to probation ineligible.  Also ineligible under the guidelines.

25  Supervised release, with respect the statutory provision, at


                                42


1  least four years.  Guidelines four to five.  Statutory

2  provision as to a fine $2 million.  Guideline provisions

3  $10,000 to $2 million.  Restitution is inapplicable under both

4  the statutory and guideline provisions.  A special assessment

5  of $100 applies with respect to the statutory and guideline

6  provisions.

7        Let me just go back and clear up one quick point

8  insofar as the exceptions were concerned.  While I did note for

9  the record that I find that the government had demonstrated by

10  a preponderance of the evidence that the drug quantity

11  attributed by the probation officer was in all likelihood

12  accurate, I should also note for the record that in order to be

13  in the guideline range which the probation officer found would

14  be appropriate, as little as 20 grams of crack cocaine could

15  have been sold.  And I certainly find that the government had

16  demonstrated that amount by a preponderance of the evidence.

17        Now, back to my findings here.  If I'm repeating

18  myself, so be it.  Restitution is inapplicable under both the

19  statutory and guideline provisions.  And a special assessment

20  of $100 applies with respect to both.

21        All right, Mr. Brabender, prior to imposing sentence

22  is there anything you want to say or is there anything your

23  client would like to say on his own behalf?

24        MR. BRABENDER:  Your Honor, I did in the exceptions

25  add additional matters for consideration, I will not repeat


43


1  what's in there, just make the arguments on behalf of Mr.

2  Gavin.  Mr. Gavin doesn't have anything that he would like to

3  address the court on at this time.  I have nothing further,

4    your Honor.

5         THE COURT:  Mr. Gavin, just so that I'm clear, you

6    understand you do have the right, you have the right of

7    allocution at sentencing.  But my understanding is you do not

8    want to say anything, is that correct -- you do have the right

9    to do it if you want to -- come on up to the podium, sir.

10        THE DEFENDANT:  I just want to apologize to the

11   court for my involvement in this crime.  It is a waste of the

12   government's time and money.

13        THE COURT:  I can't hear you, Mr. Gavin, take your

14   time and speak up?

15        THE DEFENDANT:  I just wanted to apologize to the

16   court for my involvement in this crime.  And wasting the time

17   and money for this situation.

18        THE COURT:  All right, thank you, Mr. Gavin.

19        MR. BRABENDER:  Also, I didn't mention it, I do want

20   to stress the fact that he does have two young children and a

21   spouse as well.

22        THE COURT:  What are their ages?

23        MR. BRABENDER:  Seven and five.

24        THE COURT:  All right.  Thank you, sir.  Mr.

25   Piccinini.

44

1       MR. PICCININI:  Your Honor, you have the benefit of

2   the presentence report which sufficiently sets forth the

3   details.  Two issues for the record that I want to bring up.

4   One, after Ms. Welsh testified, I did provide the Jencks

5   material, the portion of Ms. Welch's previous statement to the

6   FBI.  There is no cover letter, I just want to make it clear

7   for the record that that statement was actually provided to

8   defense counsel consistent with the Jencks Act.

9       THE COURT:  Are you talking about the 302?

10      MR. PICCININI:  The FD-302, which was actually

11  admitted as an exhibit, the pertinent portion of that

12  concerning Mr. Gavin was provided to defense counsel.

13      THE COURT:  Just as a housekeeping matter, the

14  portion you were asking her to read, the 302, do we have a

15  cover sheet on that or is that somehow identified?

16      MR. PICCININI:  This entire 302 and the portion that

17  she read through is actually highlighted.

18      THE COURT:  It's identified, all right.

19      MR. PICCININI:  Your Honor, one other issue.

file:///A|/GAVINSTG.TXT

20   Recently a family member of Mr. Gavin's went to Ms. Welsh's

21   work and approached her, concerning she was a snitch, an

22   informant.  Ms. Welsh tried to express she really wasn't an

23   informant in this case, she was a charged defendant as well.

24   She suffered a bit of harassment.  To the point the person

25   indicated, who I believe is the defendant's wife, that she

45

1   wanted to come over the counter at Ms. Welsh.  I'm just putting

2   this on the record today because I am concerned that if any

3   attempts to intimidate a government witness would continue, I

4   don't know the extent to which any of this is attributable to

5   Mr. Gavin --

6          THE COURT:  Have there been charges filed as a

7   result of this?

8          MR. PICCININI:  There have not been, it does not

9   rise sufficiently to the level.  Ms. Welsh actually didn't want

10  us to go any further with it.  But she is still concerned that

11  in light of her being requested to testify today that someone

12  from the family is going to attempt to approach her and the

13  government would not take that lightly.  That's all that I

14  have.

15          THE COURT:  Is that Mr. Gavin's wife in the back?

16          MR. PICCININI:  I don't believe she's here in the

17  courtroom today, your Honor.

18          THE COURT:  Well, aside from calling it to my

19  attention, there's really nothing that can be done at this

20  point absent --

21          MR. PICCININI:  I'm calling it to your attention and

22  making sure that Mr. Gavin and his family --

23          THE COURT:  All right, I think Mr. Gavin has just

24  heard what you said.

25          MR. PICCININI:  Thank you, your Honor.


                                46


1           THE COURT:  You did understand that, Mr. Gavin,

2   didn't you?

3           THE DEFENDANT:  Yes.

4           THE COURT:  In the wake of Booker, the Sentencing
                         ———————
5   Guidelines are of course advisory.  However, I'm obligated to

6   consult those guidelines in determining an appropriate

7  sentence.  In addition to the guidelines under Booker, I must

———————

8  also consider various other factors set forth at Section

9  3553(a), which requires courts to impose a sentence which is

10  "sufficient, but not greater than necessary" to comply with the

11  purposes set forth in paragraph two.  Section 3553(a)(2)

12  provides in relevant part that these purposes are:

13          (A)  to reflect the seriousness of the offense, to

14  promote respect for the law, and to provide just punishment for

15  the offense;

16          (B)  to afford deterrence to criminal conduct;

17          (C)  to protect the public from further crimes of

18  the defendant; and

19          (D)  to provide the defendant with needed

20  educational or vocational training, medical care, or other

21  correctional treatment in the most effective manner.

22          That section further directs that the sentencing

23  court consider, (1) the nature and circumstances of the offense

24  and the history and characteristics of the defendant; the kinds

25  of sentences available; the need to avoid unwanted sentencing

47

1   disparities among defendants with similar records who have been

2   found guilty of similar misconduct; and the need to provide

3   restitution to any victims of the offense.

4        So in fashioning the sentence here, I have carefully

5   considered the advisory guideline range, as well as the other

6   factors which I have just articulated.

7        In my view dealing crack cocaine is a very serious

8   offense.  It is an extremely addictive and destructive drug.

9   I note from reviewing the presentence report, insofar as it

10  reflects on the history and the characteristics of this

11  defendant, that this defendant has a significant criminal

12  history dating back to age 14.  There have been multiple

13  criminal convictions.  He has frequently violated the terms and

14  conditions of his parole.  He has shown a complete disregard

15  for authority figures in general and the law in particular.

16  I also think that deterrence in a case like this is, insofar as

17  fashioning an appropriate sentence, is important.  And very

18  importantly, based upon this defendant's background, extensive

19  criminal background, I consider the protection of the public to

20  be an extremely important factor as well.

21        All right, Mr. Gavin, stand up for sentencing.

22            Pursuant to the Sentencing Reform Act of 1984, it is

23   the judgment of the court that the defendant, Eugene Lamont

24   Gavin, is hereby committed to the custody of the Bureau of

25   Prisons to be imprisoned for a term of 125 months.  The term of


48


1   imprisonment imposed by this judgment shall run concurrent to

2   the defendant's term of imprisonment imposed at Docket Nos.

3   1371 of 2004 and 129 of 2005, Erie County Court of Common

4   Pleas.

5            Upon release from imprisonment, the defendant shall

6   be placed on supervised release for a term of four years.

7            Within 72 hours of release from the custody of the

8   Bureau of Prisons, the defendant shall report in person to the

9   probation office in the district to which this defendant is

10   released.

11            While on supervised release, the defendant shall not

12   commit another federal, state or local crime; shall comply with

13   the standard conditions of supervision recommended by the

14   Sentencing Commission and adopted by this court; and shall

15   comply with the following additional conditions.

16        The defendant shall not illegally possess a

17   controlled substance.

18        The defendant shall not possess a firearm or

19   destructive device.

20        The defendant shall participate in a program of

21   testing and, if necessary, treatment for substance abuse as

22   directed by the probation officer, until such time as the

23   defendant is released from the program by the probation

24   officer.

25        Further, the defendant shall be required to


                                    49


1   contribute to the costs of services for any such treatment in

2   an amount determined by the probation officer but not to exceed

3   the actual cost.

4        The defendant shall submit to one drug urinalysis

5   within 15 days after being placed on supervision and at least

6   two periodic tests thereafter.

7        It is further ordered that the defendant shall pay

8   to the United States a special assessment of $100, which shall

9   be paid to the United States District Court Clerk forthwith.

10          I find the defendant does not have the ability to

11  pay a fine, consequently, I will waive a fine in this case.

12          Mr. Gavin, do you understand that you do have the

13  right to appeal this sentence which I imposed here this

14  morning, but if you choose to do so, you must do so within 10

15  days, do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Anything further from the defendant?

18          MR. BRABENDER:  No, your Honor.

19          THE COURT:  All right, we're adjourned.

20

21          (Whereupon, at 11:05 a.m., the Sentencing

22  proceedings were concluded.)

23

24                  - - -

25


                              50


1              C E R T I F I C A T E
                _ _ _ _ _ _ _ _ _ _

2

3

4

5       I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11   _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24